IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. JKB-25-231 |
| | * | |
| RON WARDLOW, | * | |
| | * | |
| Defendant. | * | |
| | * | |

******

**UNITED STATES' RESPONSE TO**
**DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

The United States of America, by and through undersigned counsel, hereby responds to Defendant Ron Wardlow's Motion to Suppress Statements (ECF No. 44). The Court should deny Defendant's motion because (1) the Defendant volunteered all pre-*Miranda* waiver statements and (2) the Defendant's waiver of his *Miranda* rights was voluntary, knowing, and intelligent.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  February 27, 2025, Carjacking and Arrest

On February 27, 2025, just before 1:00 a.m., the victims in this case, B.P. and J.F., drove B.P.'s car to the Citgo gas station located at 1500 Eastern Avenue in Baltimore. While filling the tank, the two went to buy water. When they returned to the car, a man—wearing a blue-and-black jacket, grey hoodie, jeans, black Under Armour shoes, black Nike gloves, and a black ski mask—approached B.P. and asked for a ride. When B.P. refused, the man followed him around to the driver's side of the car, pulled a gun from his waistband area, pointed the gun at B.P., and demanded the keys. B.P. immediately gave the keys to the man, who then got in B.P.'s car and drove away. Police later recovered surveillance footage from the Citgo showing the man's attire and the carjacking itself.

B.P. immediately called 911 to report the armed carjacking, and police arrived at the Citgo to take statements. While there, B.P. and J.F. informed officers that some of their electronic devices—including cell phones—were still in B.P.'s car and had location tracking applications active. J.F.'s brother was able to update the two victims in real time as to the location of the devices, and while the police were taking statements, B.P. and J.F. noted that the devices had stopped moving and remained stationary in the same location. Police and the victims believed this indicated that the carjacker had removed the devices from B.P.'s car. After the victims spoke with police, B.P.'s girlfriend arrived to take them home, but they first drove to the area where the electronic devices had last been located.

When the victims arrived at that location, they discovered B.P.'s car was still there and was just backing out of the area. B.P. called the police to alert them to the car's location, and officers from the Region Auto Theft Task Force quickly found the car at a nearby BP gas station, located at 2617 Gwynns Falls Parkway. Surveillance footage later recovered from the BP showed the car arriving at a pump around 2:12 a.m. and the Defendant getting out of the driver's-side door. The Defendant was wearing a grey hoodie, jeans, and black Under Armour shoes, all consistent with the clothes worn by the carjacker. After parking at a different pump— apparently on realizing the gas cap was located on the other side of the car—the Defendant then walked to the gas station attendant to make a purchase.

Police arrived at the BP shortly after the Defendant walked to the attendant, and when the Defendant saw police approaching, he immediately fled on foot. A helicopter providing aerial surveillance tracked the Defendant's flight to the cellar-level entryway of a nearby residence, where officers arrested him shortly after he hid there. During Defendant's flight, the aerial surveillance clearly captured him throwing something in the front yard area of a residence on

2

Braddish Avenue.  Officers searched that area immediately after the Defendant was arrested and found the keys to B.P.'s car on the ground.  When officers arrested the Defendant, he was smoking what appeared to be a marijuana cigarette.

From the moment of his arrest until he was transported to the police station for an interview, the Defendant made several spontaneous statements to officers.  These statements are primarily seen in the body-worn camera footage collected from Officer Charles Trenary (Baltimore County Police Department) and Officer Creinton Goodwin (Baltimore Police Department).  This footage is attached to the government's Response as Exhibits 1 and 2, respectively.

For example, immediately after being placed under arrest, the Defendant said, "I didn't even do nothing.  What did I do?  Can y'all tell me what I did?"  Officer Trenary responded, "You were in a stole-o [a stolen car]."  After a brief pause, the Defendant said, "I promise y'all I wasn't in no stole-o."  Ex. 1 (2:21 a.m.).

As he was being taken back to the gas station for transport, the Defendant repeatedly engaged Officer Trenary.  An example of one exchange follows:

> WARDLOW:  Can you please be considerate?
> TRENARY:   Considerate about what?
> WARDLOW:  Like can you help me out, bro? [*unintelligible*]
> TRENARY:   Yeah, we'll talk to the guys down there, but you've
>            gotta go down there and be honest with them. Tell
>            them what you know.
> WARDLOW:  I'm 25, bro.
> TRENARY:   Ok.
> WARDLOW:  I'm on probation.  You feel me?  I can't get 15
>            years.
> TRENARY:   What are you on probation for?
> WARDLOW:  Carjacking.
> TRENARY:   Hm.
> WARDLOW:  But I just copped out because I was scared.

Ex. 1 (2:29 a.m.).

3

At multiple other points before he was transported to the station, the Defendant similarly approached Officer Trenary and other officers with requests for a "second chance," explanations about why he ran from police, or offers to cooperate. Other than clarifying questions, such as the above, no questions were asked of the Defendant. Officer Trenary and other officers—as seen above—repeatedly told the Defendant that he would have the chance to speak with detectives when he was at the police station.

Officers searched the Defendant incident to arrest and found a black ski mask and black Nike gloves, both consistent with the mask and gloves worn by the carjacker, as seen in the Citgo surveillance footage. Inside B.P.'s car, officers found a blue-and-black jacket, again consistent in appearance with the carjacker's jacket and identified by both victims as the jacket they had seen him wear. And shortly before the car was towed by police for processing—but after body-worn cameras were turned off—Officer Trenary retrieved J.F.'s bag from the car to give back to J.F. Before handing the bag over, Officer Trenary looked inside and discovered a black Glock 9mm Luger handgun (serial no. CAXX809), loaded with 31 rounds of ammunition in an extended magazine. J.F. confirmed the gun did not belong to him or B.P., and Officer Trenary took the gun into evidence.

## B. Post-Arrest Interview of the Defendant and *Miranda* Waiver

After the Defendant was transported for questioning, he was placed in an interview room shortly before 3:30 a.m. *See* ECF No. 44, Exs. 1 and 2. Roughly 45 minutes later, during which time the Defendant appeared to fall asleep in his chair, Detective Theodore Anderson entered the room. ECF No. 44 Ex. 1 (4:13 a.m.). Apparently seeing that the Defendant had been asleep, Detective Anderson asked the Defendant what day it was and if he knew why he was there. And when the Defendant appeared uncertain—or drowsy—Detective Anderson asked if he

4

understood that he was "here today in reference to an incident where a car was taken." The Defendant said he understood that. Detective Anderson asked the Defendant whether he wanted to talk about the incident, and the Defendant shook his head. To clarify what was meant by the head-shake, Detective Anderson asked, "No? You don't want to tell your side of the story about what happened?" The Defendant then said, "I didn't take no car."

Detective Anderson then began explaining some of the evidence that incriminated the Defendant, and the Defendant interjected, "I was just trying to get home." Detective Anderson said, "Before we get started with all that, I gotta go over your advice of rights." Detective Anderson notified the Defendant that the interview was being recorded on audio and video, and the Defendant said he understood. Shortly after that, Detective Anderson asked the Defendant whether knew what "his rights" were. The Defendant responded, "My rights? My *Miranda* rights?"[1] Detective Anderson said, "Yeah, so you know what I'm talking about." ECF No. 44 Ex. 1 (4:16 a.m.).

Prior to going through the *Miranda* warning, Detective Anderson searched the Defendant and retrieved the black Nike gloves and black ski mask that had been found on him previously, as well as some cash in the Defendant's pockets. During the search, Detective Anderson asked the Defendant questions about what was on his person, such as whether there was anything sharp in his pockets. The Defendant responded to these questions, but at points, his speech seemed to be slurred and he appeared to still be drowsy.

While Detective Anderson was counting the money found in the Defendant's pockets, the Defendant appeared to be nodding off. When Detective Anderson noticed this, he asked the

---

[1] In the Motion to Suppress, defense counsel transcribed most of the initial interaction between Detective Anderson and the Defendant, *see* ECF No. 44 at 3–4, but the transcription of this particular exchange omitted the Defendant's acknowledgment that he understood he was going to be mirandized.

Defendant to "hang in there" while he continued to inventory the cash.  And when Detective Anderson noticed that the Defendant again appeared to be drowsing after the inventory was done, he asked, "Are you with me?"

Before issuing *Miranda* warnings, Detective Anderson asked the Defendant a series of questions aimed at figuring out whether the Defendant was impaired to the point that the interview should not proceed.  ECF No. 44 Ex. 1 (4:24 a.m.).  Detective Anderson asked the Defendant whether he could read and write, who the president was, and the date.  Of those questions, the Defendant was unable to answer only the precise date but knew that it was February 2025.  Detective Anderson also asked the Defendant whether he was under the influence of any drugs or alcohol.  Although the Defendant initially said, "Yes," he changed his answer when asked a follow-up question.

At 4:26 a.m., Detective Anderson presented the Defendant with a *Miranda* waiver form and read through each of the rights on the form with the Defendant, indicating when and where the Defendant should initial and sign the form.[2]  After explaining each right, Detective Anderson asked the Defendant if he understood the right.  Each time, the Defendant said he did, and Detective Anderson directed him to initial the form in the proper place.  At two points, the Defendant again appeared to nod off, but each time, after being asked by Detective Anderson, the Defendant confirmed he understood that right.  And after going through his advice of rights, Detective Anderson got verbal confirmation—as well as the Defendant's signature—that he was waiving those rights and wanted to speak with the police.  After the Defendant waived *Miranda*,

---

[2] Investigators have made every effort to locate the *Miranda* waiver form seen in the interview video, but it appears to have been lost.  This is immaterial to suppression, as the Defendant is on video acknowledging and waiving his *Miranda* rights.

Detective Anderson again asked the Defendant about why he kept "dozing off," and the Defendant said he was "just tired."

During the remainder of the interview, the Defendant answered—and declined to answer—several questions about what had happened that night. Among other incriminating statements, the Defendant offered shifting explanations for how he ended up in the car: Initially, he claimed to have been helping put gas in "a hack [taxi]," before he admitted that he had encountered the two victims and asked for a ride. The Defendant then claimed that instead of offering him a ride, one of the victims instead gave the Defendant the keys to the car, but throughout the interview, the Defendant repeatedly insisted that he never "touched" the victims and did not "steal" anything. Every time Detective Anderson confronted the Defendant or tried to elicit a confession that he had stolen—or even "taken"—the car, the Defendant refused to speak, changed the subject, or asked for the opportunity to become "a federal informant."

### C. Procedural History

On August 7, 2025, a federal grand jury sitting in the District of Maryland returned an indictment charging the Defendant with Carjacking, in violation of 18 U.S.C. § 2119(1) (Count One); Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c) (Count Two); and Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1. On March 3, 2026, the Defendant filed the instant Motion to Suppress Statements. ECF No. 44. The Defendant's criminal trial is set to begin on April 6, 2026. ECF No. 40.

## II.    ARGUMENT

The Defendant's motion divides his February 27, 2025, statements into two buckets: pre- and post-*Miranda*. None of the statements should be suppressed. None of the Defendant's pre-*Miranda* statements meet the threshold for suppression under the Fourth Amendment because

they were not made pursuant to custodial interrogation. And the Defendant's post-*Miranda* statements are all admissible because the Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.

### A. The Defendant's Pre-*Miranda* Statements Were Volunteered, Not the Result of Custodial Interrogation.

A defendant's statements to law enforcement are only suppressible if made pursuant to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A Defendant's volunteered statements are not subject to the protections outlined in *Miranda*. *Id.* at 478. Custody alone is not sufficient to trigger those protections; "'[i]nterrogation' . . . must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). *Innis* further defined "interrogation" as "express questioning or its functional equivalent," in other words, "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 300–01.

Since *Innis*, courts have further clarified that the key inquiry regarding suppression is the last point: whether the police spoke or acted in such a way that "they should have known that the suspect was reasonably likely to incriminate himself in response." *United States v. Johnson*, 734 F.3d 270, 276 (4th Cir. 2013), *cert. denied* 572 U.S. 1151 (2014). Statements regarding the charges a defendant is facing are generally considered actions "normally attendant to arrest and custody" and do not rise to the level of "interrogation." *United States v. Blake*, 571 F.3d 331, 340 (4th Cir. 2009) (quoting *Innis*, 446 U.S. at 301). Questions from officers are not *per se* interrogation, "even if the question subjectively exerted a coercive effect on a suspect." *Johnson*, 734 F.3d at 276. In *Johnson*, in particular, the Fourth Circuit held that after that defendant volunteered that he had "information" for the police, a "follow-up inquiry 'what do

you mean?' would not have seemed reasonably likely to elicit self-incriminating information." *Id.* at 277.

The Defendant's Motion with regard to his pre-*Miranda* statements focuses primarily on whether he was in custody, which he indisputably was from the moment he was arrested. ECF No. 44 at 8–10. But that is not the end of the inquiry. None of his pre-*Miranda* statements were the result of interrogation.

Many of the Defendant's statements after his arrest were purely voluntary, such as his immediate questions upon being arrested: "I didn't even do nothing. What did I do? Can y'all tell me what I did?" Officer Trenary's response to those questions, "You were in a stole-o," was akin to informing the Defendant of the charges against him, which is a normal part of taking a suspect into custody. *See Blake*, 571 F.3d at 340–41 (admitting statements made in response to officers presenting the defendant with a statement of charges). The Defendant's numerous approaches to officers to ask for a "second chance" or to volunteer his services as an informant also fall in this category of voluntary statement, as does his interruption of Detective Anderson to say, "I was just trying to get home."

Other statements made by the Defendant were certainly responses to officer questions, but none of these questions rose to the level of "interrogation" because the officers would not have reasonably expected the questions to elicit an incriminating response. *See Johnson*, 734 F.3d at 276 ("The *Miranda* analysis does not turn on the form of an officer's articulation."). For example, when the Defendant volunteered to Officer Trenary that he was on probation, Officer Trenary had no way of knowing that his follow-up question, "What are you on probation for," would reveal that the Defendant had a prior carjacking conviction. *See id.* at 277. Similarly, when Detective Anderson asked the Defendant, "You don't want to tell your side of the story

about what happened," the question was clearly asked to determine whether the Defendant was invoking his right to remain silent, not to elicit any incriminating response. *See Blake*, 571 F.3d at 341–42 (officer's taunt of "I bet you want to talk now, huh?" was not reasonably expected to elicit an incriminating response). The Defendant's choice to answer the question with "I didn't take no car" was his and his alone; Detective Anderson could not have reasonably foreseen that response based on the question asked.

The Defendant makes conclusory and vague assertions that the police's words and actions after his arrest were "reasonably likely to elicit an incriminating response." ECF No. 44 at 10. But the Court, now having seen the actual statements, can easily conclude that none of the Defendant's statements made prior to his waiver of *Miranda* rights were the result of custodial interrogation. The Court should deny the Defendant's Motion as to those statements.

### B. The Defendant's Waiver of *Miranda* Rights Was Voluntary, Knowing, and Intelligent.

When a defendant seeks to suppress statements made after a *Miranda* waiver, the government bears the burden of proving, by a preponderance of the evidence, that the waiver was voluntary, knowing, and intelligent. *United States v. Robinson*, 404 F.3d 850, 859 (4th Cir. 2005). To determine that waiver was voluntary, the court must find that the waiver was "the product of free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Cristobal*, 293 F.3d 134, 139 (4th Cir. 2002) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). To determine that the waiver was knowing and intelligent, the court must find that the waiver was "made with a full awareness of both the nature of the right being abandoned and the decision to abandon it." *Id.* at 140. The court must consider the totality of the circumstances surrounding the interrogation, "including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.*

Voluntariness centers around whether statements were "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976)) (alterations in original). It is a question of whether the defendant's "will has been overborne and his capacity for self-determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1976); *see also Cristobal*, 293 F.3d at 141. And "[t]ruthful statements about [the defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary." *Braxton*, 112 F.3d at 782 (quoting *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987)) (alterations in original).

Specifically relevant to this case, a defendant's mental condition is one of the circumstances for the court to consider, but intoxication or any other impaired mental state alone is "insufficient to render a waiver involuntary" or unknowing. *United States v. Walker*, 607 F. App'x 247, 255–57 (4th Cir. 2015) (citing *Cristobal*, 293 F.3d at 141) (affirming admission of post-*Miranda* waiver statements made by a defendant whose alcohol intoxication was characterized as "obvious, but not extreme"). For the waiver to be unknowing, the defendant must be so impaired that he does not know where he is or what is happening. *See United States v. Smith*, 608 F.2d 1011, 1012–13 (4th Cir. 1979) (*Miranda* waiver was valid for a drunk defendant who nevertheless appeared to be "sober enough to know where he was and to recognize who the people around him were" (internal quotation marks omitted)). A defendant's knowing when to answer or not answer questions is also relevant to determining whether he has knowingly waived his *Miranda* rights. *See United States v. Whitfield*, 695 F.3d 288, 302 (4th Cir. 2012) (*Miranda* waiver was valid when defendant was "wet and cold," but "seemed intelligent enough to decide when to provide information and when not to" (internal quotation

11

marks omitted)); *Walker*, 607 F. App'x at 257 (*Miranda* waiver was valid for intoxicated defendant because his selective and inconsistent responses showed awareness of his circumstances).

Here, the Defendant's will was far from overborne. *See Cristobal*, 293 F.3d at 141. The Defendant's Motion depicts Detective Anderson as "intimidat[ing] him" by explaining the evidence against the Defendant. ECF No. 44 at 11. But Detective Anderson simply told the Defendant the truth about his situation, precisely the kind of thing that the Fourth Circuit has determined is "not the type of 'coercion' that threatens to render a statement involuntary." *Braxton*, 112 F.3d at 782. Detective Anderson did not threaten the Defendant; he was not violent; he did not make promises, direct or indirect; and he did not exert any improper influence. *Id.* at 780. The Defendant's "capacity for self-determination" remained intact throughout the night; his *Miranda* waiver was voluntary. *See Schneckloth*, 412 U.S. at 225.

The Defendant's characteristics and conduct also demonstrate that he was fully aware "of both the nature of the right being abandoned and the decision to abandon it" when he waived his *Miranda* rights. *Cristobal*, 293 F.3d at 140. For example, when told by Detective Anderson that he had to be informed of his "rights," the Defendant asked if that referred to his "*Miranda* rights," demonstrating his understanding of the rights he had and what waiver would mean. *See id.; United States v. Brooks*, Crim. No. ELH-20-34, 2024 WL 1140692, *19 (D. Md. Mar. 14, 2024) (factoring in the defendant's "familiarity with the conduct of a custodial interview" as a characteristic weighing in favor of his knowing and intelligent waiver).

Importantly, throughout the interview, whenever Detective Anderson asked a question the Defendant perceived as inculpatory—such as framing his conduct as "taking" the car, asking about a gun, etc.—the Defendant refused to directly answer the question. *See Whitfield*, 695

F.3d at 302.  At multiple points, the Defendant even turned the tables on Detective Anderson, accusing him of "mak[ing] it sound like [the Defendant is] guilty" or "trying to blackball" the Defendant.  ECF No. 44 Ex. 1 (between 4:47 a.m. and 4:51 a.m.).  Over the course of the entire interview, the Defendant continually made self-serving statements that he apparently believed were exculpatory; he was unaware at the time that his shifting explanations were contradicted by other evidence.  *See Walker*, 607 F. App'x at 257 ("[The defendant's] responses and actions were more in line with an individual attempting to avoid detection than one who was unaware of what he was doing or saying.").  The Defendant's repeated offers during the interview to cooperate and/or become an informant further underscore that he understood his situation and wanted to turn things to his advantage.

The Defendant's tiredness or intoxication amount to the same thing: mental impairment.  And the Defendant's mental impairment did not rise anywhere near the level of overwhelming his free will or preventing him from understanding his waiver of rights.  *See Smith*, 608 F.2d at 1012–13; *Walker*, 607 F. App'x at 256–57.  The Defendant was clearly drowsy, and at one point, his speech was slurred.  The Defendant also appears to have begun smoking a joint during the brief time he was hiding from police before being arrested.  But as evidenced by his conduct, he knew where he was and what was happening throughout the interview.

Despite the Defendant's best efforts to frame Detective Anderson's questions about his mental state as taking "advantage" of his "impaired capacity," ECF No. 44 at 12, the interview footage clearly shows Detective Anderson doing his best to confirm that the Defendant was not so impaired that the interview should not proceed.  Ex. 1 (4:24 a.m.).  Similarly, the footage shows that at each stage of the *Miranda* waiver, far from being an illiterate zombie, the

13

Defendant understood his rights as they were read and willingly waived them.  Being sleepy is not sufficient to render the Defendant's waiver involuntary or unknowing.  *See id.* (4:26 a.m.).

The totality of the circumstances in this case—the Defendant's characteristics, his conduct, and the interrogation itself—show that when the Defendant waived his *Miranda* rights, he did so voluntarily, knowingly, and intelligently.  *See Cristobal*, 293 F.3d at 140.  He was never threatened, intimidated, or coerced into making statements.  Whatever mental impairment the Defendant felt at the time clearly fell short of overbearing his will or preventing him from understanding his situation.  The Defendant's post-*Miranda* statements are admissible.

## III.   **CONCLUSION**

For all the foregoing reasons, the Court should deny the Defendant's Motion to Suppress Statements.

Respectfully Submitted,

Kelly O. Hayes
United States Attorney

  /s/
Alexander Levin
John W. Sippel, Jr.
Assistant United States Attorneys